UNITED STATES *v.* W. J. WESTERFIELD (No. 4727) [1]

[1] C. A. D. 507.

United States Court of Customs and Patent Appeals, January 23, 1953

*Charles J. Wagner*, Acting Assistant Attorney General (*Daniel I. Auster* and *Chauncey E. Wilowski*, special attorneys, of counsel), for the United States.
*William A. Porteous, Jr.* (*Porteous & Johnson* of counsel) for appellee.

[Oral argument October 9, 1952, by Mr. Auster; submitted on brief by appellee]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, COLE, and JACKSON (retired), Associate Judges

GARRETT, Chief Judge, delivered the opinion of the court:

This is an appeal from the judgment of the Third Division of the United States Customs Court, Abstract 56193, 28 Cust. Ct. 350, granting remission of additional duties assessed by the Collector of Customs at the port of New Orleans, Louisiana, upon merchandise described generally as electric trouble lights having magnetic bases by means of which bases the lights could be attached to metal surfaces adjacent the place where work requiring lighting was being done.

The merchandise was imported into the United States from Norway upon an order stated on the invoice used in making the entry to have been accepted December 18, 1949. From official papers in the record it appears that the vessel upon which the shipment was made sailed from the Norwegian port January 27th or 28th, 1949, and (after a stop at Tampico, Mexico) arrived at New Orleans March 10, 1949.

We understand that the merchandise was found to be subject to duty upon the basis of foreign value as that value is defined in section 402 (c) of the Tariff Act of 1930. The dutiable value, therefore, was determinable upon the price at which the merchandise was freely offered for sale to all purchasers in Norway in the usual wholesale quantities *at the time of the exportation of the shipment here involved*, that is, in January, 1949.[1]

The consular invoice used in entering the merchandise, prepared by or for the Norwegian seller, recited a purchase price per unit, i. e., per light, of $2.90, an "Invoice Total" of $2,933.00 and a "Current Price (Home Consumption)" of $3.10. In making the entry on March 18, 1949, the $3.10 per unit price was given as the dutiable value.

---

[1] Section 402 (c) reads:

(c) Foreign value: The foreign value of imported merchandise shall be the market value or the price *at the time of exportation* of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States. (Italics ours.)

The invoice, which is referred to in the record as No. 391, bears date of February 22, 1949, the consular certificate being dated February 23, 1949.   Upon it are two typewritten notations reading respectively:

(a) REPLACING INVOICE #196 certified Jan. 28, 1949, naming New Orleans, La. as port of arrival and New Orleans, La. as port of entry.

(b) Letter from exporter stating reason for replace invoice attached to triplicate hereof.

The copy of invoice No. 196 so referred to, which the importer had received, was not brought to the attention of the customs officials by, or on behalf of, the importer at the time the entry was made on March 18, 1949, but it later became a part of the official record forwarded to the Customs Court along with other papers pertinent to the consideration of the petition for remission, and it also was formally introduced in evidence, being specially marked as "Importer's Exhibit No. 1," during the direct examination of appellee Westerfield as a witness. It bears date of January 27, 1949, and the only difference here material between it and invoice No. 391 is that the former states the "Current Price (Home Consumption)" to be $3.85 instead of $3.10.   It is apparent that if No. 196 had been used in making entry, the foreign value would have been treated as $3.85 per unit, and the official appraisal was finally made at that value.

According to the petition for remission, which was sworn to, invoice No. 391 was "airmailed" to the petitioner prior to the arrival of the merchandise at New Orleans which, as has been stated, was on March 10, 1949.   Accompanying it was the letter of explanation referred to in the second notation upon the invoice, mentioned *supra*, which letter was also introduced in evidence during the taking of the testimony of Mr. Westerfield and marked "Importer's Exhibit No. 2."

It seems proper to state at this juncture that the record discloses that Mr. Westerfield was a stockholder in, and general manager and vice-president of, a corporation styled Owesen & Co., Inc., whose place of business was located at New Orleans, Louisiana; that there were two other corporations, having the same corporate name and apparently doing business in (a) Los Angeles, and (b) San Francisco, California, a party by the name of A. B. Owesen being chairman of the board of each of the corporations; that each of the three corporations was a "separate and distinct entity;" that Owesen & Co., Inc. had an office at 125 Broad Street, New York City; that some importations of merchandise similar to that here involved were made through the port of New York at or near the time of the instant importation; and that Mr. Westerfield owns stock in only the corporation whose place of business is located in New Orleans, but that copies of at least some of the correspondence relative to the importation of the instant merchandise went to the offices of all three corporations.

The letter hereinbefore referred to as Importer's Exhibit No. 2 was addressed to "Messrs. Owesen & Co, Inc., 238 Chartres Street, New Orleans, Louisiana, U. S. A.," and it is indicated that copies were sent to San Pedro (the Los Angeles, California, port), New York, and San Francisco.

The letter was dated 24th February, 1949. It bears the notation "Re new set of consular invoice." The complete text reads:

We have pleasure in enclosing a new set of consular invoice No. 391 certified 23rd. February 49 replacing invoice No. 196 of 28th. January 49.

As you see, the current price for home consumption has been changed to $3.10 also for this shipment. We feel sure that this new invoice will reach you before the arrival of the goods and this should help you saving a lot of duty.

In connection with this particular phase of the case, it is proper also to state just here that during the cross-examination of Mr. Westerfield, counsel for the Government caused to be introduced a copy of a letter from the Norwegian shipper addressed to "Messrs. Owesen & Co., Inc., 125 Broad Street, New York 4, N. Y., U. S. A." dated "22.2.49" (that is, February 2, 1949), the text of which reads:

We regret very much recieving [sic] your letter of the 14th. inst about the trouble you had with the consular invoice covering the 1.000 lamps sent to you with the Lyngenfjord. With surprise we have taken to our notice that you had to pay duty on our price for the inland market for sale to wholesalers. However we have communicated with the United States Embassy in Oslo and will tomorrow swear to the fact that the price will be reduced for the home consumption when we again start selling lamps in Norway. We hope in this way to get the price $3.85 altered to $3.10. With this writing, which we will send you by registered post by air, to the customs. The same will be sent to New Orleans and they have to do the same. Fortunable the ship has not arrived there yet. The best thing had been that you had studied the consular invoice at receipt and then given us your information. We had not the slightest idea that the duty should not be paid on the export price but on the highest obtainable price on the home market. We feel sure that you will get your money back as we have done our utmost here.

If it is some information from the Underwriters please write or wire at once as we are very anxious to know where we stand. We are also anxious to know the new name of the lamp which you owing to a letter from Mr. A. B. Owesen should register in New York. As soon as we know this and also something further about the approval we will put the new tools in work. In spite of the higher duty tax on the first shipment you must be able to calculate the lamps and with our cooperation do your best in order to obtain the lowest possible price and also the largest possible distribution. We are without any information about making the non waterproof type in USA.

Hoping to hear from you by return, we remain

As we view the statements in the foregoing exhibits, the only possible conclusion relative to the current price at which merchandise such as or similar to that here involved was being freely offered for sale by the Norwegian exporter in January, 1949, for consumption in Norway is that (expressed in terms of United States currency) such price was $3.85 per unit. Upon the record here presented that constituted the

foreign value, which in this instance was the dutiable value. The Norwegian concern did *indicate a hope* that when it began selling for home consumption again it might make such sales at a price of $3.10 per unit, and it seems to have been thought that this price might, in some way, be made retroactive as to dutiable value in the case of the involved importation. This obviously was an erroneous impression on the part of the exporter. The expression "We had not the slightest idea that the duty should not be paid on the export price but on the highest obtainable price on the home market," in "United States Exhibit A," *supra*, demonstrates the unfamiliarity of the exporter with the United States customs laws, but it is not helpful to the importer in this case. Lest this last observation of ours be misunderstood, we take occasion to say that the trial court did not intimate that the quoted expression was regarded as being helpful to the importer, but we deduce from its decision, hereinafter more fully set forth, that lack of knowledge of the customs laws *on the part of Mr. Westerfield*, constituted a very important, if not wholly controlling, factor in arriving at its conclusion that remission should be granted.

The brief on behalf of the Government before us states:

The petitioner was ignorant of the law governing his entry herein. He was unacquainted with the proper method of procedure and, for that reason, failed to turn over to the Customs authorities, or to his broker, all of the papers in connection with the case prior to entry. The trial court was convinced that his failure to turn over all the papers to his broker was not due to any dishonest intention and found satisfactory evidence supporting the petition. The question is whether this conclusion is sound within the decided cases.

Before further reviewing the evidence in the case, we take occasion to say that it seems somewhat odd to us that the petition for remission in this case was filed in the name of Westerfield. We assume that Owesen & Co., Inc., is a corporation capable of suing and subject to being sued as a corporate entity.

It is in evidence by the testimony of Mr. Westerfield that Mr. Owesen, chairman of the board of the three different corporations, made arrangements to "take a distributorship" of the lights and that, upon a visit to New Orleans at some time not identified, he informed officials of the New Orleans corporation that he had placed the order for 1,000 lights to be delivered to the New Orleans office. So far as the record shows, that was the first time Mr. Westerfield knew anything about the matter. He also testified, over the objection of Government counsel, that he knew that New York received 1,000 lights approximately one month before the New Orleans office received their lights, and it is fairly inferable from the record that there was some sort of controversy concerning that shipment which, however, was settled and is of no moment here except as a part of the background from which to consider the conduct of the parties. As has been stated

hereinbefore, the letter of which United States Exhibit A is a copy, was addressed to Owesen & Co., Inc. at New York and it probably applied as much to the shipment made to New York as it did to that made to New Orleans, the latter being the one here involved.

From the foregoing, it would seem that the corporation is the actual party in interest and the remission proceeding properly might have been instituted in its corporate name.

However, no question is presented involving the legitimacy of the somewhat unusual course followed in bringing the action in the name of Mr. Westerfield who was vice-president and general manager of the corporation which was doing business in Louisiana and who had an interest therein as stockholder. It is clear from the record that he was the individual who had the responsibility of making arrangements for entering the merchandise at New Orleans. The entry in fact was made by a customs broker named Beverly A. Ittmann, who was called and examined as a witness on behalf of the Government.

The evidence may perhaps be best understood by readers of the decisions in the case by the courts if they understand and bear in mind that Mr. Westerfield was wholly inexperienced in the matter of entering merchandise for customs purposes. There is no reason to doubt his testimony given on direct examination as follows:

Q. Had you or anyone else * * * connected with the New Orleans office ever received a foreign shipment or had anything to do with the payment of customs duties before?
A. Never.
Q. Never in your life had you any dealings with the customs office?
A. Never.

It appears from his testimony that he received both invoice No. 196 and invoice No. 391 prior to the arrival of the merchandise and that when he received "the invoice and the shipping notice" he "went over to the customhouse" to find out how he "should go about entering it." He stated that his advice was to see a Customs broker and that he went to see Mr. Ittmann who was highly recommended.

We quote the following from the decision of the trial court:

At the hearing held at the port of New Orleans, the petitioner introduced the testimony of Mr. Warren Westerfield who was the general manager and vice president of the importing concern (Oweson & Co., Inc.) at the time the merchandise was imported. This witness testified that prior to the time of the arrival of the shipment in question, the New Orleans office of the petitioner received consular invoices from the manufacturer of this merchandise showing a unit price of $2.90 and a home consumption price of $3.85 each. Before the shipment arrived the petitioner received a new set of invoice prices for this merchandise, and upon entry petitioner used the invoice that he deemed applicable, which showed a price per unit of $3.10. Petitioner was not familiar with customs practice and used the services of Mr. Ittmann, a customhouse broker, in making entry of the merchandise. The witness stated that he delivered the papers relating to this

shipment to a young lady in the office of the broker, but that he did not see the broker himself until the value of the merchandise was questioned by the customs officials, at which time he was asked for the original invoice. Petitioner stated further that the actual purchase price of the merchandise was $3.10 per unit and that he believed that to be the proper value for duty purposes.

On cross-examination, the witness testified that the first invoice received (exhibit 1) stated the figure of $3.85 in the column headed "Current Price (Home Consumption Per Unit)" and that the second invoice, which is part of the official file, showed a price of $3.10 per unit, but that he was billed for only $2.90.

The Government introduced the testimony of Mr. Ittmann, the customs broker who made entry of the merchandise. His testimony contradicted that of the former witness in that he stated that Mr. Westerfield turned over the papers to him personally and that to his knowledge no papers were turned over to him by the young lady in his office. This witness stated that he asked Mr. Westerfield to furnish him with all documents and correspondence pertaining to this shipment; that Mr. Westerfield turned over certain documents which the broker submitted to the United States appraiser; and that the merchandise was entered at a value of $3.10. This witness did not know of the existence of another invoice indicating a price of $3.85 until after he was notified by the Government that his client was penalized for false invoices, at which time Mr. Westerfield gave him the other invoice. The invoice No. 391 used by this witness in making entry was marked "REPLACING INVOICE #196 * * *." He did not ask Mr. Westerfield for the other invoice for the reason that the customs officials did not ask him for it.

Evidently the trial dourt did not attach any particular importance to the recited discrepancy between the testimony of Mr. Westerfield and that of Mr. Ittmann relative to the first person to whom the papers were delivered for preparing the entry.

In its decision, of which the judge before whom the testimony was taken was the author, it is said:

It is unfortunate that Mr. Westerfield, the representative of the importer, was unacquainted with the proper method of procedure and that he did not turn over to his broker all of the papers in connection with the case prior to entry. However, this member of the court heard the testimony of Mr. Westerfield at the trial in New Orleans and is convinced that his failure to turn over to his broker the first invoice, No. 196 (petitioner's exhibit 1), was not due to any dishonest intention. His demeanor was frank and forthright. He stated that the second invoice was received prior to the receipt of the merchandise and prior to the time of making entry and that the letter of explanation (petitioner's exhibit 2) also was received prior to the shipment. The fact that the second invoice, used as the basis of entry by Mr. Ittmann, the broker, plainly showed that it replaced another invoice previously submitted, would seem to rather conclusively negate the idea of bad faith on the part of Mr. Westerfield. He apparently felt that the action of the manufacturer in lowering the home consumption price from $3.85 to $3.10 each was a bona fide transaction, and he would hardly have considered it discreet or safe to submit an invoice for the inspection of the Government officials, which showed that it replaced another and earlier one, had he entertained the least idea at the time of defrauding the revenue of the United States. The fact that he did submit the second or corrected invoice would seem to prove his contention that he honestly felt the first invoice was of no further value or concern to anyone. It must be remembered that the testimony shows this one transaction was his first and only experience in the importation of merchandise.

We ourselves do not regard the discrepancy in the testimony as being of any material consequence. Whether the papers were received in the first instance by the broker himself or by his assistant, it was the broker who actually made the entry, and appellee is legally chargeable with the broker's acts.

We do not feel, however, that the failure to include the earlier invoice (#196) among those given the broker and displayed to the customs official receiving the entry, may properly be treated as having no significance. To so treat it would be out of harmony with a long, unbroken line of decisions of this court, which, in our opinion, were sound and should not be overruled or disregarded.

The particularly pertinent provisions of the statute here involved (section 489 of the Tariff Act of 1930, 19 U. S. C. 489) read:

If the final appraised value of any article of imported merchandise which is subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof shall exceed the entered value, there shall be levied, collected, and paid, in addition to the duties imposed by law on such merchandise, an additional duty of 1 per centum of the total final appraised value thereof for each 1 per centum that such final appraised value exceeds the value declared in the entry. * * * Such additional duties shall not be construed to be penal and shall not be remitted nor payment thereof in any way avoided, except * * * upon the finding of the United States Customs Court, upon a petition * * * supported by satisfactory evidence * * * that the entry of the merchandise at a less value than that returned upon final appraisement was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise. * * *.

In the course of our decision in the case of *Les Parfums De Molyneux* v. *United States*, 26 C. C. P. A. (Customs) 323, C. A. D. 36, we recited the legislative history appertaining to the foregoing section.

It may be said that during several years following the enactment of the Tariff Act of 1922 doubt existed as to the jurisdiction of this court to review decisions of the United States Board of General Appraisers (now the United States Customs Court) upon petitions for remission of additional duties assessed under the provisions of section 489 of that Act, which so far as here pertinent, was the prototype of the here involved section 489 of the Tariff Act of 1930, *supra.* That doubt was set at rest by the decision of the Supreme Court of the United States announced on June 1, 1925, in the case of *United States* v. *Fish*, 268 U. S. 607. The high court, speaking through Chief Justice Taft, there affirmed the decision of this court, speaking through the late Judge Oscar Bland, in the case of *Fish* v. *United States*, 12 Ct. Cust. Appls. 307, T. D. 40315, holding that this court was clothed with such jurisdiction.

The decision of this court which was so affirmed as to our jurisdiction by the Supreme Court had been rendered June 28, 1924, prac-

tically 12 months before the decision affirming it. In our decision we had referred to the provision of the statute that lack of intent to defraud, conceal or deceive must be supported by satisfactory evidence, and had discussed briefly the meaning of "satisfactory evidence."

The only question presented to the Supreme Court, or at least the only question which it decided, was that relating to the court's jurisdiction in remission cases.

It did not lay down any rule defining "satisfactory evidence," nor make any comment upon the subject.

In our decision reference was made to a decision rendered October 6, 1902, by the United States District Court of the Northern District of New York, in the case of *United States* v. *Lee Huen, and fourteen other cases*, a deportation proceeding, 118 Fed. 442.

In that decision the district court quoted from *1 Greenleaf on Evidence*, Sec. 2, a paragraph reading:

> By "satisfactory evidence" which is sometimes called "sufficient evidence," is intended that amount of proof which ordinarily satisfied an unprejudiced mind beyond reasonable doubt. The circumstances which will amount to this degree of proof can never be previously defined. The only legal test of which they are susceptible is their sufficiency to satisfy the mind and conscience of a common man; and so to convince him that he would venture to act upon that conviction in matters of highest concern and importance to his own interest.

This court did not apply the rule of "reasonable doubt" in the *Fish* case, *supra*. What we said upon the subject was summarized in a head note which read:

> * * * The language of the section [489 of the Tariff Act of 1922, similar to sec. 489 of the 1930 Act, here involved], "satisfactory evidence," does not mean satisfactory to the board, but means the amount of proof which would ordinarily satisfy an unprejudiced and reasonable mind.

As a matter of fact, this court has never applied the rule of reasonable doubt in determining the meaning of "satisfactory evidence," and in the case of *Glendenning, McLeish & Co.* v. *United States*, 13 Ct. Cust. Appls. 387, 390, T. D. 41320, the court, speaking through the late Presiding Judge William J. Graham, said:

> * * * it is argued by the Government that a remission cannot be ordered except upon satisfactory evidence and that satisfactory evidence is evidence that convinces the mind beyond a reasonable doubt. We are aware that courts have in some instances attached such a meaning to the term "satisfactory evidence." We have not, however, followed these holdings in remission cases. In *Linen Thread Co.* v. *United States*, 13 Ct. Cust. Appls. 301, T. D. 41220, we thus defined "satisfactory evidence":
>
> Proof of the circumstances and conditions, and a full and candid explanation thereof is required. Anything less than that is not sufficient.
>
> To the same effect are *Hauptman* v. *United States*, 13 Ct. Cust. Appls. 295, T. D. 41218; and *Finsilver, Still & Moss* v. *United States, supra* [13 Ct. Cust. Appls. 332, T. D. 41250]. [Italics quoted.]

⠂ The great difficulty which confronts the courts in formulating a test for "satisfactory evidence" grows out of the fact that a party seeking remission of duties is confronted by the necessity of proving negatives and it is frequently extremely difficult satisfactorily to establish a negative, particularly a negative as to personal intent, because the actual intention of an individual is known only to himself and God.

When the here involved statute is dissected it is found that the person seeking remission must prove that the act of undervaluation was without any intent (a) to defraud the revenue of the United States; (b) to conceal or misrepresent the facts of the case; (c) to deceive the appraiser as to the value of the merchandise. Each of these three elements must be established by "satisfactory evidence."

No extensive citation of authorities is necessary to support the statement that the rule is thoroughly established that a mere categorical declaration by one seeking relief under section 489, *supra*, that he had no intention of doing any one of the three things, may not be accepted as of itself and by itself constituting "satisfactory evidence" within the meaning of the statute.

In a decision of one of the early cases respecting duty remission brought to the court (*Finsilver, Still & Moss* v. *United States*, 13 Ct. Cust. Appls. 332, T. D. 41250), it was declared that the statement of one seeking duty remission to the effect that he had no intent to defraud, conceal or deceive, "*standing alone without corroborating facts or circumstances, being the issue to be determined by the court, certainly is not such proof as is required.*" (Italics new here.)

The text of that decision shows clearly that it was meant that such a statement by one seeking remission of duties did not of itself, standing alone, constitute satisfactory evidence, within the meaning of the remedial statute.

No case has been brought to our attention, nor have we found any as a result of our own researches, in the decision of which this court has departed from the rule thus announced early in the exercise of the remission jurisdiction, and in a recent decision in the case of *United States* v. *Balfour, Guthrie & Co., Ltd.*, 39 C. C. P. A. (Customs) 199, C. A. D. 487, we substantially restated a declaration which had been stated often in decisions of previous cases to the effect that the burden rests upon a petitioner for duty remission, or refund, under section 489, *supra*, to show *affirmatively* that the entry was made without intent to defraud.

The reason for such a rule as that so announced by this court is obvious. If a categorical denial of intent were acceptable as being of itself and by itself conclusive and hence completely satisfactory evidence, the door would be legally opened wide to fraud upon the revenue, concealment of facts, and deception of appraisers.

Another long established rule which has been consistently followed by this court is that a lack of knowledge of the law governing dutiable values, importations, and entries, or, in other words, ignorance of customs law and of the processes of its administration, no matter how fully proven and believed, can not be accepted as meeting the meaning of satisfactory evidence. To obtain the benefit of the remission statute a petitioner must show more than lack of knowledge.

In another of the early decisions of this court in a remission case (*Wolf & Co.* v. *United States*, 13 Ct. Cust. Appls. 589, 591, T. D. 41453, rendered March 13, 1926), the court, speaking through the late presiding judge William J. Graham, after citing a number of decisions, said:

> * * * Summarized, these adjudged cases announce certain fundamental facts which the petitioner must establish if he is to obtain relief: First, He must show that in undervaluing his goods he was acting in entire good faith; second, that there were no facts or circumstances known to the petitioner when he made his entry which would cause a prudent and reasonable person to question the correctness of the values given by him; third, that he has made to the collector in making his entry, a full and candid disclosure of all the material facts in his possession bearing upon the value of the merchandise imported.

The rule so stated has been consistently followed. It was quoted verbatim and applied in the decision of the case of *R. W. Gresham* v. *United States*, 27 C. C. P. A. (Customs) 106, C. A. D. 70, and the principle of it was again approved and applied in the decision of the *Balfour, Guthrie & Co.* case, *supra*. Its application in numerous other decisions of this court over the many years intervening between 1926 and the present could be cited, but such citations would be superfluous. Suffice it to say that we regard that statement as the controlling law of today. It is, therefore, the rule applicable in the consideration of the instant case.

In the instant case appellee, Westerfield, did not in fact make any categorical statement while testifying that he had no intent to defraud, conceal, or deceive. In the petition itself it was merely alleged that the fact that petitioner was never "guilty of evil intent" had been established.

We are not disposed, however, to quibble about the absence of a categorical denial from his testimony nor about the form of expression used in the petition. For the purpose of this decision we are willing to proceed on the theory that a categorical denial would have been made if a question had been posed to elicit it.

The difficulty we experience in agreeing with the decision of the trial court does not grow out of any suspicion of appellee's integrity, but is due to the fact that there is no proof of matters essential to a holding that satisfactory evidence has been produced.

The actual testimony as to lack of knowledge on the part of Mr. Westerfield concerning customs matters is limited to what may be

called the mechanics of entering merchandise for customs purposes. He was not interrogated as to his actual knowledge or lack of knowledge of market prices and values and their place in entering merchandise, but he did have in his possession a paper reciting a current foreign market price, which constituted a foreign value in excess of the value at which the merchandise was entered. It may be agreed that he did not himself understand the significance of the situation, but surely it must be held that the information in the official papers in his possession was sufficient to render it imperative, under the authorities, for him to make inquiry. Prudence required it. Surely it has not been shown that there were no facts or circumstances known to petitioner when the entry was made which would cause a prudent and reasonable person to question the correctness of the values given by him. In the decision of the *Wolf & Co.* case, *supra,* such a negative showing was declared to be a "must."

Again, since the value, as stated on the first invoice (#196) was an essential fundamental to appraisement, and since Mr. Westerfield had that in his possession, it can not be held to have been established that "he made to the collector in making his entry a full and candid disclosure of all the material facts in his possession bearing upon the value of the merchandise."

We feel that it is due the trial court, particularly the judge who wrote the decision before whom the testimony in the case was taken (and who, referring to his observation of the witness, expressed the view that Westerfield's "failure to turn over to his broker the first invoice * * * was not due to any dishonest intention") to say that we have the highest respect for his powers of observation and his ability to judge.

Our disagreement with the trial court is based solely upon the belief that, to meet the requirements of "satisfactory evidence," more should appear than a mere lack of knowledge on the part of one having the responsibility of entering merchandise for customs purposes. Being conscious of his own lack of knowledge, Westerfield should have made more effort than he is shown to have made to inform himself. This belief is thought to be in harmony with the long line of decisions rendered from the very beginning of the exercise of the jurisdiction which the Supreme Court held had been conferred upon this court respecting duty remission. We feel the trial court's decision unduly restricts the meaning of "satisfactory evidence," a vital term of the remission statute.

The judgment is *reversed.*

WORLEY, Judge, having been unavoidably absent at time of argument, JACKSON, Judge, retired, recalled to serve in conformity with section 294 (c) and (d), Title 28, United States Code.

O'CONNELL, Judge, dissenting.

The provisions of the statute to be applied here were especially revised by Congress to promote the ends of justice, not to defeat them. *Les Parfums de Molyneux* v. *United States*, 26 C. C. P. A. (Customs) 323, C. A. D. 36. And this court early announced its unqualified support of that purpose and its eager desire to comply with what was then the new legislation in *Klein, Messner Co.* v. *United States*, 13 Ct. Cust. Appls. 273, 277, T. D. 41212, wherein our distinguished predecessors in a well-documented and unanimous decision held that: "Clearly this is a remedial statute to be liberally construed to promote the object of the legislation."

Moreover, the mere fact that the final appraised value of the imported merchandise in the case at bar was in excess of the entered value, even had it been very much in excess thereof, does not of itself require that additional duties be collected here from the importer Westerfield, a former officer of the Navy home from abroad after twelve years of naval service aboard ships. *International Graphite & Electrode Corp.* v. *United States*, 27 C. C. P. A. (Customs) 36, C. A. D. 58.

Those simple fundamentals have been lost by the majority in the maze of unwarranted concern expressed here over the deterrent effect the judgment of the Customs Court might not have on slack and dishonest importers who may otherwise and hereafter conspire to defraud the revenues of the United States. The arbitrary procedure thus pursued ignores the outstanding fact disclosed by the record that the judgment appealed from is one of justice and fairness to the "frank and forthright" importer of these particular goods.

The evil which Congress sought to remedy more than thirty years ago by the original enactment of section 489 of the Act of 1922, which was carried over and enacted without change in the Act of 1930, was defined by the report of the United States Tariff Commission made upon the revision of the customs administrative laws in 1918, wherein, among other things, the report stated:

*Undervaluation.*—The greatest cause of dissatisfaction in the administration of the customs laws as they now stand is the provision imposing additional duties in cases of undervaluation. These duties, under existing law, accrue whenever merchandise is entered by the importer at a value less than that finally fixed by the appraiser. They are applied automatically, and without regard to any evidence of the importer's guilt or innocence, * * *

The auspicious beginning with reference to the liberal interpretation of sec. 489 made by the Court of Customs Appeals in *Klein, Messner supra*, has since been generally continued here. Our official reports establish that often as not we have here reversed the judgments of the Customs Court based on an unsupported finding there of an intent to defraud the revenue of the United States by an honest and

diligent importer. E. g., *Schrikker* v. *United States*, 13 Ct. Cust. Appls. 562, T. D. 41433. However, this court, as in the case at bar, has at times imposed its own rule of evidence, nullified the remedial purpose for which section 489 was enacted, and in effect reverted to the very abuse which the statute was designed to eliminate.

The judicial precedents and the legislative background of the involved provisions of the tariff act dealing with fraud, forfeiture, and the imposition of additional duties for intent to defraud the revenues of the United States require that the burden of proof shall lie on the importer in those cases only where probable cause is shown by the Government for fraud or a suspicion of fraud, to be judged by the court before whom such case is tried. See, for example, *Taylor et al.* v. *United States*, 3 How. [44 U. S.] 197, 211; *Vitelli & Son* v. *United States*, 250 U. S. 355.

In *Vitelli* the Supreme Court reversed the judgement of our court based upon a prolonged and profound decision. 7 Ct. Cust. Appls. 243–283. In so doing the Supreme Court held that where the collector reliquidates an entry on the ground of fraud, the Court of Customs Appeals cannot presume that the action of the collector was correct so as to cast the burden of disproving fraud upon the importer. That ruling has been nowise modified or reversed.

There is no dispute that this court has the right to review and remedy a flagrant judgment of the Customs Court rendered under section 489 by any judge thereof, who alone has been endowed by Congress with the power to hear the evidence and to apply the appropriate penalty or remedy as the case may be.

It is elementary that no valid jurisdiction exists in an appellate court to retry doubtful issues of fact on a cold record and substitute its judgment for that of the trial court with respect to such issues. Moreover, appellee as the prevailing party in the case at bar must be given the benefit of all reasonable inferences which can be drawn from the evidence.

The following excerpts from the record establish a few significant, interesting, and pertinent facts which may or may not have escaped attention. With respect to the merchandise, the importer Westerfield testified:

Witness: The value of the light was not so much the monetary cost as much as it was the novelty of the light.
Q. What was novel about it?
A. The light incorporated a magnetic piece which could be used working around engines so long as you had a steel surface to attach the light to and the light could be focused.
Q. It could be fastened on the bulkhead of an engine?
A. Yes, and turned in any direction you wanted.

\* \* \* \* \* \* \*

XQ. What is the nature of this merchandise—they are portable?

A. They are portable hand lights; they are electric lights with a cord on them—portable—and they have a magnetic base where you just throw them up against a bulkhead on a ship and they will hang on and you can turn them in any direction; they are trouble lights.

  *   *   *   *   *   *   *

Q. In having the merchandise entered as you did at a price of $3.10 did you attempt in any way to defraud the revenue of the United States Government or conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise?

A. Never.

  *   *   *   *   *   *   *

XQ. Now when you went to see Mr. Ittman you had a conversation with him didn't you about making entry for you?

A. Previous to making—

XQ. Before entering the invoice you had correspondence with him?

A. I asked Mr. Ittman about importing merchandise. Mr. Ittman told me that was the nature of his business. *When I received the invoice and the shipping notice I went over to the Customhouse to find out how I should go about entering it. My advice was to see a customs broker and I went over to Mr. Ittman.* (Italics supplied.)

  *   *   *   *   *   *   *

XQ. Mr. Ittman you know that Mr. Westerfield employed you because you had been highly recommended?

A. Yes.

XQ. You know that Mr. Westerfield had confidence and faith in you?

A. Yes.

XQ. You know he still does, don't you?

A. Yes.

XQ. You also found that Mr. Westerfield was not familiar with Customs practice didn't you?

A. That I understood at the time he made entry.

XQ. And this was the first time he had ever had any connection with Customs?

A. Yes.

XQ. And you found him an upright young businessman?

A. Yes.

The higher value for the merchandise in the markets of Norway was nowise clearly established by the facts of record:

Judge Ekwall: There is already something in the record that there was no home market for something like three years isn't that right?

Mr. Weil: This letter says there was.

Judge Ekwall: No, it doesn't. It says when they resume selling in the home market they will make it $3.10. (Discussion off record.)

The foregoing are some of the supplemental items which may be used to embellish the facts enumerated in the respective decisions of the majority as well as the Customs Court. These itemized facts do not of course include the intangibles which basically contributed to the ultimate conclusion of the trial court. There certain essential points were in sharp conflict and were determined by the presiding judge in accordance with the importer's version of the transaction.

The judge in his disposition of the case may have felt, and justly so, that the young lady employed in the office of the broker Ittman was the one who actually entered these goods, and had she been called as a witness, as she should have been in the interests of justice, such a fact would have been developed. The importer Westerfield called at the Customhouse at the very outset so as to properly enter the goods. Customs officials otherwise were given the fullest assistance by him in every respect from start to finish. Those officials through regular channels of customs procedure had in their possession data which related the story of the importer's transaction.

Moreover, custom officials at the port of New Orleans have heretofore demonstrated their own carelessness in the conduct of the business of that office. See *Standard Oil Co. of Louisiana* v. *United States*, 33 C. C. P. A. (Customs) 152, C. A. D. 329.

This opinion might thus be prolonged in the discussion of additional factors disclosed by the record and the reasonable inferences which the trial judge may have drawn therefrom. In all events there was more than ample evidence to support the finding of fact made by the court below and the judgment of the Customs Court based thereon should be affirmed. "Surely we do not want to confirm Mr. Dooley's observation to the effect that an appeal is an occasion for one court to show its contempt for another." [1]

---

[1] *Land* v. *Dollar*, 341 U. S. 737, 750.
[2] C. A. D. 508.